Well, I get to say that this is case number 11-345, Fisher against the University of Texas at Austin. Then you get to say it. Mr. Chairman, the general suitor trained me too well. Mr. Chief Justice and members of the Court, and may it please the Court, the central issue here is whether the University of Texas at Austin can carry its burden of proving that its use of race as an admissions plus factor and the consequent denial of equal treatment, which is the central mandate of the Equal Protection Clause, to Abigail Fisher met the two tests of strict scrutiny which are applicable. Mr. Ryan, before we get to that, because the Court is supposed to raise it on its own, the question of standing, the injury, if the injury is rejection by the University of Texas, and the answer is no matter what, this person would not have been accepted, then how is the injury caused by the Affirmative Action Program? Well, Justice Ginsburg, the first injury that was before the Court was the use of a system which denied equal treatment. It was a constitutional injury, and part of the damage claim was premised directly on the constitutional issue. How do you get past Texas v. Lesage with that injury, which says that mere use of race is not cognizable injury sufficient for standing? Lesage was litigated on its merits, and the question was whether Lesage could carry his case on summary judgment when it was apparent that his complaint, which was that he was denied access to the graduate program at the University of Texas, was not sustainable. As I said, there are several factors in this case that are quite different. First there's a constitutional injury as such, and the Court has recognized it. Second, the fact premise, she could not have been allowed in under any circumstance, was never tested below, wasn't raised below, it comes up in a footnote in... Can I go to another side? She's graduated. Correct. She disclaimed a desire after her application to go to the school at all. She was permitted to apply for the summer program and get in automatically, and she didn't, correct? No, that's not correct, Your Honor. She was not automatically admitted. She was considered for the summer program and rejected. You're talking about the CAP program, where she could have attended a different university in the Texas system, and had she been able to achieve... But she's graduated. Injunctive relief, she's not going to get. So what measure of damages will she get, or will she be entitled to? Well, that issue, of course, is bifurcated, and we've reserved the ability to... But you have to claim an injury. So what's the injury? Well... That you're claiming that would sustain a claim of damages? The denial of her right to equal treatment is a constitutional injury in and of itself, and we had claimed certain damages on that. We started the case before it was clear whether she would or wouldn't be admitted. You still haven't answered how Lusange gets away from that. Well, Lusange... So give me another damages question. If we then, on remand, were to assert damages contingent upon the fact that she should have been admitted to UT and was not admitted, we would then have to prove that, but for the use of race, she would be admitted. That's the thrust of Lusange. Whether we can prove it or can't prove it is something you can't tell on this record. It's merely asserted, and I would point out that Texas said below there was no way to determine that issue. We've had cases involving alleged discrimination in the state contracting, and we haven't required the person who was discriminated against because of race to prove that he would have gotten a contract otherwise, have we? No, sir. It's been enough that there was a denial of equal protection. That is correct, and that is our first premise. And I would say that the same issue was raised in Bakke. And in Bakke, the contention was he couldn't have gotten into the medical school, therefore he has no case. The Court said in footnote 14, to Justice Powell's opinion, that's a matter of merit. It is not a matter of standing. I think in parents involved, the same type of contention was made with respect to the Louisville class plaintiffs whose son had been admitted to the school of his choice, and the Court said damages are enough to sustain standing. There's a live damages claim here, and I don't think there's a question of that. The claim is not necessarily that she would have been admitted, but that she was denied a fair chance in the admission lottery, just as when a person is denied participation in the contracting lottery, he has suffered an injury. Yes, Justice Scalia, I agree with that. Justice, if you're going to the merits, I want to know whether you want us to — are you going to the merits, and if so, why overrule a case into which so much thought and effort went and so many people across the country have depended on? Justice Breyer, we had said very carefully we were not trying to change the Court's disposition of the issue. The issue in Grutter, could there be a legitimate, a compelling interest in moving — in using race to establish a diverse class? What the problem that we've encountered throughout the case is there are varying understandings, not of the legitimacy of the interest, but how you get there. Is it necessary to use race to achieve that interest? What does a critical matter? Your question is whether — your point is, does your case satisfy Grutter? Is that what you're arguing? We litigated on that basis, yes. How do you want to argue it right now in the next 10 minutes? I'm interested because I have a very short time to get my question out, and I need to know how you're going to argue it. But Justice Breyer, our argument is we can satisfy Grutter if it's properly read. But we've seen — May I ask you on that specifically? Let's take away the 10 percent solution. Suppose the only plan were the one that is before the court now. No 10 percent. This is the exclusive way that the university is attempting to increase minority enrollment. Then, if we had no 10 percent solution under Grutter, would this plan be acceptable? Well, I think that there would be flaws under Grutter, even if you assumed a way, something that can't be assumed a way because it is a matter of Texas law. That is, there is a top 10 percent program — Well, then the question is, can you have both? But it seems to me that this program is certainly no more aggressive than the one in Grutter. It's, in fact, more modest. Well, I don't agree with that, and let me explain why. In order to satisfy Grutter, you first have to say that you are not just using race gratuitously, but it is in the interest of producing a critical mass of otherwise underrepresented students. And so to be within Grutter framework, the first question is, absent the use of race, would we be generating a critical mass? To answer that question, you've got to examine in context the so-called soft factors that are in Grutter. Is there an isolation on campus? Do members of minority feel that they cannot speak out? One social studies that this university did said that minority students overwhelmingly, even with the numbers they have now, are feeling isolated. So why isn't that even under your tests? We can go back to whether substantial evidence is adequate, is necessary or not. Why does their test fail? Well, the survey was a random survey. It's not reported in any systematic way. They evidently interviewed students, and it was all about classroom isolation. Was it done before or after they announced the decision to reinstitute racial? It was done after President Faulkner had made the declaration they were going to do it. It was done before. Which came almost immediately after our decision. I believe on the same day. And by the way, do you think that Grutter, this goes to Justice Breyer's question, do you think that Grutter held that there's no more affirmative action in higher education after 2028? No, I don't. Is that the holding of Grutter? That was not. I agree, but I want to get to the question. So what I'm trying to pinpoint is we have such a limited time. And to me, the one thing I want to pinpoint, since you're arguing on the satisfied Grutter, if properly understood, as you say that. In looking up, we have a two-court rule. And two courts have found, it seems to me, that here there is a certain thing. There is no quota. It is individualized. It is time-limited. It was adopted after the consideration of race-neutral means. Each applicant receives individual consideration. And race did not become the predominant factor. So I take those as a given. And then I want to know what precisely it is that Grutter required, in your opinion, that makes this different from Grutter in that it was not satisfied here. The ones I listed, two courts say are the same. So maybe there's some others. I'm not sure we agree with those courts in their method of enactment. We have a rule that if two courts say it, we're very reluctant on something connected with facts to overturn it. Well, so that's why I mentioned. And particularly in the case of considering alternatives that have worked about as well. I think that's a legal question this Court is free to ask. There are facts and there are facts. So if I might try to answer your question, there was no effort in this case to establish even a working target for critical mass. They simply ignored it. They just used words. And they said, we've got to do more. So they never answered the predicate question, which Grutter asked. Absent the use of race, can we generate a critical mass? So, I mean, that's a flaw we think is, in Grutter, we think it's necessary for this Court to restate that principle. Now, whether that... That's a normal fact that we accede to two-court holdings on? Whether there is or is not a critical mass? No, I... That's a weird kind of a fact. And I'm not saying... It's an estimation, isn't it? A judgment? Well, Justice Scalia, that is correct. And in addition, the Courts didn't find whether a critical mass... So can you tell me what a critical mass was? I'm looking at the number of blacks in the University of Texas system. Pre-Grutter, when the state was indisputably still segregating, it was 4%. Today, under the post-Grutter system, it's 6%. The 2% increase is enough for you? Even though the state population is at 12%, somehow they've reached a critical mass with just a 2% increase? Well, we don't believe that demographics are the key to under-representation of a critical mass. Now, put it aside. I don't... I'm not going to quarrel with you that if demographics alone were being used, I would be somewhat concerned. But you can't seriously suggest that demographics aren't a factor to be looked at in combination with how isolated or not isolated your student body is actually reporting itself to feel. Well, I think if you try to split out subgroups of minorities, you mistake what I think is the proper thrust of Grutter. It might be insulting to some to be thrown into a pot. Why don't you seriously suggest that? Why don't you seriously suggest that demographic makeup of the state has nothing to do with whether somebody feels isolated? That if you're in a state that is only 1% black, that doesn't mean that you're not isolated, so long as there's 1% in the class. Certainly, I wish you would take that position because it seems to me right. Well, Justice Scalia, racial balancing is not a permissible interest, and we have constantly, this Court has constantly held, not a permissible interest. And that is something we certainly agree with. I'm trying to respond to Justice Sotomayor, and in the framework of Grutter, what you're looking at is, does this person, a member of a so-called under-represented minority,  are they isolated? Are they unable to speak out? And I think we've always said, if you have a very large number, as Texas did in 2004, when they ostensibly made the decision to reinstitute race, they had 21% admission percentage of what they called the under-represented minorities. They also had about 18% admission ratio of Asian Americans. So, on campus, you're talking about about 40% of the class being minority. Now, but the test is, the test is, in your opinion, I have to write this in the opinion, the proper test of critical mass is, is the minority isolated, unable to speak out? That's the test. And that wasn't in Grutter or was in Grutter? In your opinion, it was in Grutter? Yes, it said expressly in Grutter. Isolated, and the reason it was satisfied there and not here is? In Grutter, the court assumed that the very small number of admissions, minority admissions, looked at as a whole, and it was looked at as a whole, only as a whole in Grutter, would have yielded about 3 or 4% minority admission in a class of 350, which means about 12 to 15. So what are you telling us is the standard of critical mass? At what point does a district court or a university know that it doesn't have to do any more to equalize the desegregation that has happened in that particular state over decades, that it's now going to be stuck at a fixed number and it has to change its rules? What's that fixed number? It's not our burden to establish the number. It was the burden of the University of Texas to determine whether... Well, they told, they told the district court, they took a study of students, they analyzed the composition of their classes, and they determined in their educational judgment that greater diversity, just as we said in Grutter, is a goal of their educational program, and one that includes diversifying classes. So what more proof do you require? Well, if you are allowed to state all the grounds that need to be proved, you'll always prove them in all fairness, Justice Sotomayor. Well, the question is, in the evidence, what more do you think they needed? I think I hear all you're saying in your brief is the number's fixed now. They got enough, no more is necessary. What we're saying in the brief was they were generating, in fact, a very substantial number of minority presence on campus. That's enough now. And that immediately thrust upon them the responsibility, if they wanted to essentially move away from equal treatment, they had to establish, we have a purpose, we're trying to generate a critical mass of minorities that otherwise could not be achieved. Tell me what about their use of race did not fit the narrow tailoring, not the necessity prong, as you've defined it, but the narrow tailoring that Grutter required. How is race used by them in a way that violated the terms of Grutter? Assuming that the need is there. I know you're challenging the need. Put aside whether this was necessary and whether it was an appropriate last resort in a quest for diversity and critical mass, because Grutter is not without limits. But I'll put that aside, and let me come directly to your question. First of all, if you think about narrow tailoring, you can't tailor to the unknown. If you have no range of evaluation, if you have no understanding of what critical mass means, you can't tailor to it. So you have to set a quota for critical mass. No. There's a huge difference, and it's an important one that is not well put out by the University of Texas. Having a range of view as to what would be an appropriate level of comfort, critical mass, as defined in Grutter, allows you to evaluate where you are. So we won't call it a quota. We'll call it a goal. Something Grutter said you shouldn't have. Well, just so you're aware, I think it's very important to distinguish between the operative use of that range. In other words, that's where we are, and we're going to use race till we get there every year in consideration of each application, which was a problem. Boy, it sounds awful like a quota to me that Grutter said you should not be doing, that you shouldn't be setting goals, that you shouldn't be setting quotas. You should be setting an individualized assessment of the applicants. Tell me how this system doesn't do that. This system doesn't, I mean, it's not narrowly tailored because it doesn't fit. There are certain forms of Grutter that it follows. Mr. Ryan, do you understand what the University of Texas thinks is the definition of a critical mass? Because I don't. Well, it simply reiterates the language of Grutter. They have no definition. They can't fit. Mr. Ryan, it seems to me that when you're talking about critical mass, you are relying entirely on the 10 percent is enough. They got minorities through the 10 percent, so they don't need any more. And I tried to get you originally to focus on forget the 10 percent plan. This is the entire plan. Well, let me tell you that if you look outside the top 10, the so-called AIPAI admits only, forget the top 10 for a minute, they were generating approximately 15 percent minority admissions outside the top 10, which is above what the target was in Grutter. So this is not Grutter on its fact. It's vastly different. Because of the 10 percent? No, I'm talking about only the non-top 10 percent admissions. 15 percent of those were so-called underrepresented minorities. This is without the top 10. Now, the top 10 is also a major generator of admissions for underrepresented minorities. And this was before the adoption of the plan? That is correct. I'm sorry, now I'm confused. I thought the 15 percent figure was the one that was arrived at with the 10 percent plan. With the 10 percent plan, it's much higher. In 2004, it was 21 percent for just Hispanics and African Americans. And these are the categories they used. If you add in Asians, it was over 38 percent. But I'm isolating, in response to Justice Ginsburg, I'm isolating to the non-top 10 admissions. Those are over 15 percent in that year. And they average very close to that over time. So the total generation of minority presence is a combination of the two, in fact. But the AIPAI system, which was adopted in response to Hopwood, it was, as Texas says, it was the first thing they tried to accommodate to their loss of the ability to use race directly, which came up in Hopwood. So that was their first response, to look at a more balanced admission program between academic index and personal achievement index. So it is not a system which just excludes minorities. Could you comment on this? And then I hope we can get back to Justice Alito's question. You argue that the university's race-conscious admissions plan is not necessary to achieve a diverse student body because it admits so few people, so few minorities. And I had trouble with that reading the brief. I said, well, if it's so few, then what's the problem? Let's assume that it resulted in the admission of many minorities. Then you come back and say, oh, well, this shows that we were probably wrongly excluded. I see an inconsistency here. Are you saying that you shouldn't impose this hurt or this injury generally for so little benefit? Is that the point? Yes, that's part of it. The second is the question of reasonably available alternatives. If we take Texas at its word and say they are satisfied, they are happy going on with the way they apply race today, we tried to measure, well, what difference is it making and could you achieve the same thing with a reasonably available race-neutral alternative? That's a question that was asked in Grutter. They were supposed to analyze that. They didn't look at it. But if the race-neutral alternative is the 10% plan? The race-neutral alternative includes an extension of the 10% plan because it's a major generator of minority admissions. Right now, that rings true. Would you say, and that's okay because it's race-neutral, but is it really? The only reason that they instituted the 10% plan was to increase minority enrollment. And that's the only way it works, is if you have heavily separated schools. And worse than that, I mean, if you want to go to the University of Texas under the 10% plan, you go to the low-performing school. You don't take challenging courses because that's how you'll get into the 10%. So maybe the university is concerned that that is an inadequate way to deal with it. But Justice Ginsburg, let me say that a lot of that is speculative. There's nothing in the record to support it. We don't know. They've never surveyed the top 10 admits, the minority admits, to see, well, did you... You see, the 10% plan is not imposed by the university. It's not their option to say this is not good for education because people will take easy courses. It's imposed by state law, isn't it? Correct. Anybody who's in the top 10% of any school in the state gets into the University of Texas. Yes, and even the Fifth Circuit said you can't disregard its consequences because it's a matter of law. I'm simply saying they could choose to extend it beyond where it is because it's capped today at 75%. But that's not the only option. That's not the only alternative. And certainly one simple alternative is they could look at the yield. That is, what percentage of the admitted minorities are they actually encouraging and... They could. This is what is underlying my thing here. I want to get you directly answered. I did look up the figures. And before Hopwood and the 10% plan, it looked on the African-American side that it averaged about 5% per year, really, pretty steadily. Then after Hopwood and 10%, it went down a little bit, not a lot, but it went down to about 3.5%, 4% maybe. And then they introduced Grutter and it's back up to 5%. OK, now, is that a lot? Is that a little? There are several thousand admissions officers in the United States, several thousand universities. And what is it we're going to say here that wasn't already said in Grutter that isn't going to take hundreds or thousands of these people and have federal judges dictating the policy of admission of all these universities? You see why I'm looking for some certainty. I saw what happened. You saw the numbers. Sorry, go ahead. Justice Breyer, I will answer your question. I'd like to reserve a little time. You can answer it later if you want or not answer it at all. No, I'm perfectly happy to answer your question. I think that the increase in African-American admissions you're looking at was pre-Grutter. It was generated before 2004. So I just want to make clear the record doesn't depend... to do a minimal change with the use of race. And that's why we say there's an alternative which would serve it about as well in increasing yield or indeed in reweighting the PAI, which is the critical element here, so that you put more emphasis on the socioeconomic factors and less emphasis on the essays, which are an academic measure within the PAI. So there's a lot that they could do. So now we're going to tell the universities how to run and how to weigh qualifications, too. It's not the job of the court to tell them how to do it. It's their job to examine the alternatives available to them and see if they couldn't do the same thing. Could you tell me again how race and their use of race overwhelms those other factors in their system as it's created? The question is not whether it overwhelms them. But they say, they admit, it is effective. There are admissions that would not have taken place but for somebody else would have had that place but for the use of race. And I think, Justice Kennedy, just to answer your question fully, you have to analyze those race-neutral alternatives. And if you look at parents involved, that was the critical question. The outcomes were so small that there were readily available alternatives. Perhaps you could summarize by saying, by telling us from your point of view, this plan fails strict scrutiny on one or two or both levels. A, because the objectives is inappropriate or ill-defined, and B, because the implementation is defective. Which or both of those are you arguing? We have argued both. We continue to argue both. It is not a nexus. And in what respect does this plan fail strict scrutiny under either of those, under both of those categories? Okay, under the category, the first category, was it a necessary means of pursuing a compelling interest? We don't believe they've shown any necessity for doing what they were doing. And certainly race should have been a last resort. It was a first resort. That's, in a nutshell, that prong of it. And they failed in every respect. If you go to narrow tailoring, what we're saying is they didn't consider alternatives and their treatment of, as we have pointed out, Asian Americans and Hispanics, makes an incomprehensible distinction. They say, we don't worry about Asians. There are a lot of Asians. It's a demographic measure, which is a forbidden measure. They're in excess of their share of the Texas population. But if you are trying to find individual comfort levels, if you're breaking it down between African Americans and Hispanics, then you... Counsel, you're the one who, in your brief, has assumed that they are valuing different races differently. But Asian numbers have gone up under however they've structured this PAI. And as I understand their position, race is balanced against other issues, like socioeconomics, the strength of the classes people took. It's never just standalone. So even a white student, I presume, who goes to an entirely black or an entirely Latino school who becomes class president, would get some points because he has or she has proven that they foster or can deal in a diverse environment. That's how I understood their plan. But it's not just giving you a plus because of race. It's combining that with other factors. There's a plus because of race. There are many other factors in the decision. Might I say that the white student president of the class in an ethnically different school is a measure of leadership. Leadership is an independent factor in the PAI. He's not getting that point because of his race. He's getting that point because of his leadership. That's a race-neutral criteria. It could work for anybody. So race is an independent add-on. It is something they can use to boost the PAI score, the PAS element, in any way they like. Because they say they contextualize it. And we said it's not necessary. It's not narrowly tailored. It ignores available alternatives. It gives disparate treatment to Asian-Americans because they're minorities as well. And to the extent it depends on the classroom factor, there is simply no way to relate or fit what they're doing to the solution of the problem, which they used as a major foundation of their proposal, which is the non-diverse classroom. Certainly, there's just no correspondence there. I see my time is up. We'll afford you rebuttal time since our questions have prevented you from reserving it. Mr. Garr? Thank you, Mr. Chief Justice, and may it please the Court. For two overriding reasons, the admissions plan before you is constitutional under this Court's precedence. First, it's indistinguishable in terms of how it operates in taking race into account as only one modest factor among many for the individualized considerations of applicants in their totality from plans that this Court has upheld in Grutter and plans that this Court approved in Bakke in the Harvard plan. I put that in the narrow tailoring category, that it's narrowly tailored the way Grutter did. Not the necessity prong and not the need prong. Not the necessity prong. I think most of this argument has been centered on that. That's right. And so that's the second point I was going to make, which is that the holistic admissions process at issue here is a necessary counterpart to the state's top ten percent law and works to offset the systematic drawbacks of that law in achieving an interest that is indisputably compelling, the university's interest in assembling a broadly diverse student body. Counsel, before... I need to figure out exactly what these numbers mean. Should someone who is one-quarter Hispanic check the Hispanic box or some different box? Your Honor, there is a multiracial box. Students check boxes based on their own determination. This is true under the Common Application. Well, I suppose the person who's one-quarter percent Hispanic, his own determination would be on one-quarter percent Hispanic. Then they would check that box, Your Honor. They would check that box. What about one-eighth? Your Honor, that was... They would make that self-determination, Your Honor. Your Honor, if anyone in any part of the application violated some honor code, then that could come out... Would it violate the honor code for someone who's one-eighth Hispanic and says, I identify as Hispanic, to check the Hispanic box? I don't think it would, Your Honor. I don't think that that issue would be any different than the Plano-Pelton-Grutter or the Harvard Plain. You don't check in any way the racial identification? We do not, Your Honor. In no college in America, the Ivy League's a little... How do you know you have 15% African-American, Hispanic or 15% minority? Your Honor, the same way that that determination is made in any other situation I'm aware of where race is taken to account... You say it's the same way. What is that way? The persons self-identify on that form... Do they have to self-identify? They do not, Your Honor. Every year, people do not, and many of those applications are admitted. And how do they decide? You know, they want not just a critical mass in the school at large, but class by class. How do they figure out that particular classes don't have enough? Somebody walks in the room and looks them over to see who looks Asian, who looks black, who looks Hispanic? Is that how it's done? No, Your Honor, and let me try to be clear on this. The university has never asserted a compelling interest in any specific diversity in every single classroom. It simply looked at classroom diversity as one dimension of student body diversity. I don't know what you're talking about. I mean, it is either a factor that's validly in this case or it isn't. Now, do they look to individual classroom diversity or not? And if so, how do they decide when classes are diverse? This court in Grutter, Your Honor, and maybe the most important thing that was said during the first 30 minutes is when given an opportunity to challenge Grutter, I understood my friend not to ask his court to overrule it. This court in Grutter recognized the obvious fact that the classroom is one of the most important environments where the educational benefits of diversity are realized, and so the University of Texas, in determining whether or not it reached a critical mass, looked at the classroom. I'm asking how. How did they look to the classroom? Do they require everybody to check a box or do they have somebody figure out, oh, this person looks 132nd Hispanic and that's enough? They did a study, Your Honor, that took into account the same considerations that they did in discussing the enrollment. What kind of a study? Well, Your Honor, it's in the supplemental joint appendix. It doesn't explain to me how they go about, classroom by classroom, deciding how many minorities there are. Your Honor, there are student lists in each classroom. There are student lists in each classroom that have race identified with students? No. No, Your Honor. Of course, each classroom, the university knows which students are taking its classes, and one can then, if you want to gauge diversity in the classrooms, go back and... Or you go back to what they checked on the form. Your Honor, this was part of a... That's a yes or no question. You go back to what they checked on their application form in deciding whether Economics 201 has a sufficient number of African Americans or Hispanics. That is information that's available to the university, Your Honor, the race of students that they've checked on the application. But I do want to be clear in this classroom diversity study, this was only one of many information points at the university. Well, on the classroom diversity, how does the non-top 10% part of the plan further classroom diversity? My understanding is that the university had over 5,000 classes that qualified as small, and the total number of African Americans and Hispanics who were admitted under the part of the plan that's challenged was just a little over 200. So how does that... How can that possibly do more than a tiny, tiny amount to increase classroom diversity? Well, Your Honor, first, I think that 200 number is erroneous. There have been many more minority candidates. Per class? No, not on a per-class basis. Entering class? I think in looking at the classrooms, Your Honor, what the university found was shocking isolation. How many non-top 10% members of the two minorities at issue here are admitted in each class? Your Honor, we didn't look specifically at that determination. What we did, in other words, to try to find whether there were holistic admits or percentage admits, we did conclude in 2004, and again, this was before... We did the classroom study before the plan at issue was adopted. And at that time, there were no holistic admits taking race into account. And what we concluded was that we simply... If you look at African Americans, for example, and 90% of the classes of the most common participatory... I really don't understand your answer. You know the total number of, let's say, African Americans in an entering class, right? Yes, Your Honor. And you know the total number who were admitted under the top 10% plan? We do, Your Honor, but again, at the time... Subtract A from B, you'll get C, right? Your Honor, at the time... What is the value of C per class? Your Honor, I don't know the answer to that question. Let me try to explain why the university didn't look specifically to that. Because at the time that the classroom diversity study was conducted, it was before the holistic admissions process at issue here was adopted, in 2003-2004. And so that determination wouldn't have been as important as just finding out are African Americans or Hispanics, underrepresented minorities, present at the university in such numbers that we're not experiencing... What is that number? What is the critical mass of African Americans and Hispanics at the university that you are working toward? Your Honor, we don't have one. So how are we supposed to tell whether this plan is narrowly tailored to that goal? To look to the same criteria, this court and Grutter. This court and Grutter specifically rejected the notion that you could come up with a fixed percentage. Does critical mass vary from group to group? Does it vary from state to state? It certainly is contextual. I think it could vary, Your Honor. Let me first say that my friends throughout this litigation and out in this court asserted 20% as a critical mass and that's lumping together different minority groups. Could you answer my question? What does the University of Texas think about those questions? Is the critical mass for the University of Texas dependent on the breakdown of the population of Texas? No. It's not at all. It's looking to the educational benefits of diversity on campus and I think we actually agree on what that means and what Grutter said it meant. Could you explain, I think you were trying to before, what seems to me the critical question in this case. Why didn't the 10% solution suffice? There were a substantial number of minority members admitted as a result of the 10% solution. Why wasn't that enough to achieve diversity? Let me make a couple points, Your Honor. First, if you just looked at the numbers, we don't think it's the numbers, but if you looked at the numbers after seven years, racial diversity among these groups at the University of Texas have remained stagnant or worse. 2002, African-American enrollment had actually dropped to 3%. That's one part of it. The other part of it is if you look at the admissions under the top 10% plan, taking the top 10% of a racially identifiable high school may get you diversity that looks okay on paper, but it doesn't guarantee you diversity that produces educational benefits on campus. And that's one of the considerations that the university took into account as well. I don't understand that. Why? Why doesn't it? Because, Your Honor, as is true for any group, and the Harvard plan that this Court approved in Bakke specifically recognized this, you would want representatives and different viewpoints from individuals within the same racial group just as you would from individuals outside of that group. What kind of viewpoints? Political viewpoints? Anyone's experiences where they grew up, the situations that they experience in their lives. This has nothing to do with racial diversity. You're talking about something else. Your Honor, I think it directly impacts the educational benefits of diversity in this sense. The minority candidate who has shown that he or she has succeeded in an integrated environment, has shown leadership, community service, the other factors that we looked at in the holistic review is precisely the kind of candidate that's going to come on campus, help to break down racial barriers, work across racial lines. Also, the candidate is likely to be included within the 10% rule. Incidentally, when was the 10% rule adopted? 1998, Your Honor, but with respect to your factual point, that's absolutely wrong, Your Honor. If you look at the admissions data that we cite on page 34 of our brief, it shows the breakdown of applicants under the holistic plan and the percentage plan, and I don't think it's been seriously disputed in this case to this point that although the percentage plan certainly helps with minority admissions, by and large, the minorities who are admitted tend to come from segregated, racially identified schools. Well, I thought that the whole purpose of affirmative action was to help students who come from underprivileged backgrounds, but you make a very different argument that I don't think I've ever seen before. The top 10% plan admits lots of African-Americans, lots of Hispanics, and a fair number of African-Americans, but you say, well, it's faulty because it doesn't admit enough African-Americans and Hispanics who come from privileged backgrounds, and you specifically have the example of the child of successful professionals in Dallas. That's your argument. If you have an applicant whose parents are, let's say they're, one of them is a partner in your law firm in Texas, another one is another corporate lawyer. They have income that puts them in the top 1% of earners in the country, and their parents both have graduate degrees. They deserve a leg up against let's say an Asian or a white applicant whose parents are absolutely average in terms of education and income? No, Your Honor, and let me answer the question. First of all, the example comes almost word for word from the Harvard plan that this court approved in Grutter and that Justice Powell held out. How can the answer to that question be no? Because being an African-American or being a Hispanic is a plus factor. Because, Your Honor, our point is that we want minorities from different backgrounds. We go out of our way to recruit minorities from disadvantaged backgrounds. What you're saying is that what counts is race above all. No, Your Honor, what counts is different experiences. That's a necessary response to Justice Alito's question. Well, Your Honor, what we want is different experiences that are going to come on... You want underprivileged of a certain race and privileged of a certain race. That's race. No, Your Honor, it's not race. It's just the opposite. In the LULAC decision, for example, this court said that failing to take into account differences among members of the same race does a disservice... But the reason you're reaching for the privileged is so that members of that race who are privileged can be representative. And that's race. It's members of the same racial group, Your Honor, bringing different experiences. And to say that if you took any racial group, if you had an admissions process that only tended to admit people from a particular background or perspective, you would want people from different perspectives. And that's the interest that we're discussing here. It's the interest that the Harvard plan specifically adopts. I understand my job under our precedents to determine if your use of race is narrowly tailored to a compelling interest. The compelling interest you identify is attaining a critical mass of minority students at the University of Texas. But you won't tell me what the critical mass is. How am I supposed to do the job that our precedents say I should do? Your Honor, what this court's precedents say is a critical mass is an environment in which students of underrepresented No, what you say, but when will we know that you've reached a critical mass? Bruder said there has to be a logical endpoint to your use of race. What is the logical endpoint? When will I know that you've reached a critical mass? Your Honor, this question, of course, implicates Bruder itself. And again, I think I understood my friend not to challenge that. They haven't challenged that diversity is a compelling interest at all. What we look to, and we think that courts can review this determination. One, we look to feedback directly from students about racial isolation that they experience. Do they feel like spokespersons? So you conduct a survey and ask students if they feel racially isolated? And that's the basis for our constitutional determination? Your Honor, that's one of the things that we looked at. Another is that we did look to enrollment data which showed, for example, among African Americans, that African American enrollment at the University of Texas dropped to 3% in 2002 under the percentage... At what level will it satisfy a critical mass? Well, I think we all agree that 3% is not a critical mass. At what level will it satisfy the requirement of critical mass? When we have an environment in which African Americans... How am I supposed to decide whether you have an environment within particular minorities don't feel isolated? Your Honor, part of this is a judgment that the educators are going to make that you would look to the same... So I say, when you tell me that's good enough. No, Your Honor, not at all. You would look to the criteria that we looked at. The enrollment data, the feedback from students, we also took into account diversity in the classroom, we took into account the racial climate on campus. Would 3% be enough in New Mexico, your bordering state, where the African American population is around 2%? Your Honor, I don't think it would. I mean, our concept of critical mass isn't tied to demographic. It's undisputed in this case that we are not pursuing any demographic goal. That's on page 138 of the Joint Appendix. Many key facts are undisputed here. It's undisputed that race is only a modest factor. It's undisputed that we're taking race into account only to consider individuals in their totality. Mr. Garr, I think that the issue that my colleagues are asking is, at what point and when do we stop deferring to the university's judgment that race is still necessary? That's the bottom line of this case, and you're saying, and I think rightly because of our cases, that you can't set a quota because that's what our cases say you can't do. So if we're not going to set a quota, what do you think is the standard we apply to make a judgment? I think the standard you would apply is the one set forth in Grutter, and it comes from that you would look to whether or not university reach an environment in which members of underrepresented minorities, African Americans and Hispanics, do not feel like spokespersons for their race. Members, an environment where cross-racial understanding is promoted, an environment where the educational benefits of diversity are realized. And the reason why the University of Texas concluded that that environment was not met here, it laid out in several different information points that this Court can review. That holds for only another what, 16 years, right? 16 more years and you're going to call it all off. Your Honor, we don't read Grutter as established in that kind of time clock. If you were appealing to Grutter, and that's what it said. Well, Your Honor, Grutter is this Court's precedence. We're guided by it here, at least the advocates are. And what we would look to is once we're looking at this every year, we're looking at it carefully, and once we reach that point, of course we're going to stop. But we also take some of the stuff that Grutter says you agree with, some of the stuff that it says you don't agree with. Well, I don't know that I've disagreed with anything it said. Mr. Bromley, before your time runs out there, the other point that I'd like you to answer is the argument based on parents involved that the game is just too small to warrant using a racial criterion. Your Honor. Because you have the 10%, you don't need more. So how do you answer the argument that the game is too small? First, I'd point to my friend's own concessions that the consideration of race has increased racial diversity as Hispanic and helps with minority enrollment. That's on page 130 of the Joint Appendix. Secondly, I'd point to the fact that African-American and Hispanics admissions did increase. African-American admissions doubled from the period of 2002 and 2004. So this has had a real important impact on diversity at the University of Texas. In terms of diversity, how do you justify lumping together all Asian-Americans? Do you have a critical mass of Filipino-Americans and Cambodian-Americans? The common form that's used as Asian-American but also next to that has a form that says country of origin where that can be spelled out. Do you have a critical mass as to all the subgroups that fall within this enormous group of Asian-Americans? Your Honor, we've looked to whether or not we have a critical mass of underrepresented minorities, which is precisely what the Grutter decision asks us to do. A quick point on jurisdiction. Before you get to that. Suppose you and your experience identify a numerical category, numerical standard, numerical designation for critical mass. It's X percent. During the course of the admissions process, can the admissions officers check to see how close they're coming to this numerical? No, Your Honor, and we don't. On page 389 You cannot do that? We wouldn't be monitoring the class. Isn't that what happened at Grutter? It did, Your Honor. Are you saying that Grutter is incorrect? No, Your Honor. It was one of the things that you pointed out in your dissent. What I'm saying is we don't have that problem. I'm asking whether or not you could do that. I don't think so because the Grutter majority didn't understand it to be monitoring for purposes of reaching a specific demographic. They don't monitor, but race is the only one of your holistic factors that appears on the cover of every application, right? Well, all of the holistic factors are taken into account in the application. I'm sorry. The question was whether race is the only one of your holistic factors that appears on the cover of every application. That's true on the cover of the application. Could I make one point on jurisdiction? We'll give you a little more time since I'm going to give your friend a little more time. Thank you. The fundamental problem with jurisdiction is this. First of all, they definitively cannot show that she was injured by any consideration of race. That's at pages 415 and 416 of the Joint Appendix where it makes clear that Ms. Fisher would not have been admitted to the fall 2008 class at the University of Texas no matter what her race because of that. Just to be clear, are you arguing that she doesn't have standing in Article 3 sense? Yes, Your Honor. And you addressed that in your brief in one footnote, right? We have an obligation to consider it in every case, and what you gave us is one footnote in which you said it's hard to see how she could establish cognizable jurisdiction. And there's another part of that that comes from the brief in opposition, Your Honor, which goes to the relief that she's requested. The declaratory and injunctive relief that this case began with, that request has fallen out, and that's undisputed. So the only thing that is live in this case is a request for monetary damages. That request is on page 79 of the Joint Appendix, and it's focused exclusively on a request for the return of admissions fees. And the reason why that is not enough to confer standing is that she would have paid the admissions fee no matter what policy University admissions had. What about our Jacksonville case that said it is an   confer standing is because there's a process in which there's race-conscious evaluation. Texas v. Salisage says that that injury is not sufficient in a backward-looking case like this where you only have monetary damages. In Jacksonville and all the other cases, they involve forward-looking claims for declaratory injunctive reliefs for people who are going to go out and get contracts again. So Texas v. Salisage does not have that. It's true that it's bifurcated in the sense that we could go and prove damages, but the complaint makes no doubt that the only request for monetary damages is a request for admissions fees. It says that explicitly. And this Court has said that relief that does not remedy the injury suffered cannot bootstrap a plaintiff into Federal court. That's the very essence of the redressability requirement. That comes from the Steel Coat case. Well, that's part of the injury she suffered. It's not the only injury, perhaps. It's not. She had to pay an admissions fee for a process in which she was not treated fairly. And the reason why — Why should she get her money back? The reason why the payment of that fee doesn't redress the injury, Your Honor, is that she would have paid it even if Texas didn't consider race at all. And therefore, the payment of her application feedback doesn't remedy the injury that she's complaining about. Can I ask you to get — if this is easy, do it. If not, don't. I wanted to use accurate numbers. And so I discovered — I wanted to find out how many universities actually use a Grutter-type process last year or the year before, et cetera. And one of your amici, the admissions officers, according to our library, is the only place that has that information, though it's public. And I didn't want them to do it because they're an amici of yours. And you're both here, both sides. So if you can agree on simply roughly what that number is, I'd like to know it. Otherwise, I can use pre-Grutter numbers, which are public and available. Your Honor, I don't have specific numbers. Obviously, the Ivy Leagues and the Little Ivy Leagues that have filed amicus briefs are using it. And this Court recognizes in Grutter that the best universities — many of the best universities in America have been using these plans for 30 years or more. Since we're asking questions about just curiosity, I'm curious to know, well, how many people are there in the Affirmative Action Department of the University of Texas? Do you have any idea? There must be a lot of people to, you know, to monitor all these classes and do all of this assessment of race throughout the thing. Probably a large number of people would be out of a job, wouldn't we? Wouldn't they if we suddenly went to     it's a very ambitious racial program here at the University of Texas. How much of what the University of Texas does monitor is the racial climate on campus. It does that to improve the experience for all students on campus. How many people? I don't have the specific number of people, Your Honor, but it is an important part of improving the educational experience for all students at the University of Texas no matter what their race. Thank you, Counsel. Thank you, Your Honor. Mr. Chief Justice, and may it please the Court, in resolving this case, it is important to focus on what is, or more precisely, what is not at issue. Petitioner is not challenging Grutter's reaffirmation of the principle of Justice Powell's opinion in Bakke that student body diversity is a compelling interest that can justify the consideration of race in university admissions. Colleges and universities across the country have relied on that principle in shaping their admissions policies, but it is important to recognize that there is a need for diversity in universities, and it is a vital interest to the United States that they continue to be able to do so. The core of our interest is in ensuring that the nation's universities produce graduates who are going to be effective citizens and effective leaders in an increasingly diverse society and effective competitors in diverse global markets. Does the United States agree with Mr. Garr that African-American and Hispanic applicants from privileged backgrounds deserve a preference? I understand that differently, Justice Alito. Here's how we understand what is going on with respect to the admissions process in the University of Texas, and I'm going to address it directly. I just think it needs a bit of context to do so. The top 10 percent plan certainly does produce some ethnic diversity, significant numbers get in. The problem is the university can't control that diversity in the same way it can with respect to the 25 percent of the class that's admitted to the holistic process. So my understanding of what the university here is looking to do and what universities generally are looking to do in this circumstance is not to grant a preference for privilege, but to make individualized decisions about applicants who will directly further the educational mission. For example, they will look for individuals who will play against racial stereotypes just by what they bring, the African-American fencer, the Hispanic who has mastered classical Greek. They can also look for people who have a demonstrated track record of if you have two applicants who are absolutely the same in every respect, they both come from affluent backgrounds, well-educated parents, one falls within two of the groups that are given a preference, the other doesn't. It's a marginal case. It's the last position available in the class. Under the Texas plan, one gets in, one doesn't get in. Now, do you agree with that or not? No. I think you agree that that's an incorrect statement of the facts, or do you agree that that's an incorrect understanding of the Equal Protection Clause? I think it's both. I think there is no automatic preference in Texas. I think this is right in the page 398A of the joint appendix. They describe the process as saying an applicant's race is considered only to the extent that the applicant viewed holistically will contribute to the broader vision of diversity divided by... But the hypothetical is that the two applicants are entirely the same in all other respects. And if the ability to give a racial preference means anything at all, it certainly has to mean that in the hypothetical given by Justice Alito, the minority student gets in and the other one doesn't. I disagree, Justice Scalia. What Texas I think has made clear, and I think this is a common feature of these kinds of holistic approaches, that not everyone in an underrepresented group gets a preference, gets a plus factor. It's not a matter of not everyone. It's a matter of two who are identical in all other respects. What does the racial preference mean if it doesn't mean that in that situation the minority applicant wins and the other one loses? There may not be a racial preference in that situation. It's going to depend on a holistic, individualized consideration of the applicant. I just don't understand this argument. I thought that the whole point is that sometimes race has to be a tiebreaker. And you're saying that it isn't. Well, then we should just go away. Then we should just say you can't use race. Don't worry about it. I don't think it's a tiebreaker. I think it functions more subtly than that, Justice Scalia. It doesn't function more subtly in every case. The findings by both courts below, and I'm reading from the Court of Appeals opinion at Petition Appendix page 33, the district court found that race is indisputably a meaningful factor that can make a difference in the evaluation of a student's application. If it doesn't make a difference, then we have a clear case. They're using race in a way that doesn't make a difference. The supposition has to be that race is a determining factor. We've heard a lot of talk about holistic and all that. That's fine. But unless it's a determining factor in some cases, they're using race when it doesn't serve the purpose at all. That can't be the situation. It can make a difference. It just doesn't invariably make a difference with respect to every minority applicant. You have to agree that it makes a difference in some cases. Yes, it does. But it doesn't necessarily make a difference in the situation that Justice Alito posited. The same would be true of the Bakke plan, that in some cases it's going to make a difference. The same would be true under Grutter. The same would be true under the policies now in existence of the military academies. That is exactly right, Justice Ginsburg, but the point is that it's not a mechanical factor. Now, with respect to the implementation of, in the now tailoring inquiry, with respect to the university's implementation of this, of its compelling interest, I do think it's clear that although the petitioner says she's challenging implementation, that this plan meets every requirement of Grutter and addresses the concern of Justice Kennedy that you raised in dissent in Grutter, whether Texas had to or not, it did address that concern. There's no reason why it's not a mechanical factor. It's a holistic, individualized consideration, and because of the way the process is structured, they do not monitor the racial composition on an ongoing basis. General, I think, as I take your answer, is that the supposition of Justice Alito's question is truly impossible under this system. There are not two identical candidates because there are not identical mechanical factors that accept the 10 percent plan. Under the PIA, the factors are so varied, so contextually set, that no two applicants ever could be identical in the sense that they hypothesize. That's correct. They make specific individualized judgments about each applicant. Just to get back to what we're talking about, as I understand it, race by itself is taken into account, right? That's the only thing on the cover of the application. They take race into account. The district court found, and you're not challenging, that race makes a difference in some cases, right? Yes, but the key, Mr. Chief Justice, is the way it makes a difference. It makes a difference by casting the accomplishments of the individual applicant in a particular light or the potential of an individual applicant in a particular light. What the universities are looking for principally with respect to this individualized consideration is what is this individual going to contribute to our campus? And race can have a bearing on that because it can have a bearing on evaluating what they've accomplished, and it can have a bearing, for the reasons I tried to identify earlier to Justice Alito, on what they can bring to the table, what they can bring to that freshman seminar, or what they can bring to the student government, what they can bring to the campus. But it is the correct answer to Justice Alito's. If there are ever two applicants for the GPA, the tests of the grades, the SA1, SA2, leadership, activities, awards, work experience, community service, family's economic status, school's socioeconomic status, family's responsibility, single-parent home, languages other than English spoken at home, and SAT score relative to school's average race, if you had a situation where all those things were absolutely identical, then the person would be admitted on the bounds of race. Not necessarily, Mr. Chief Justice. Because, I'm trying to make a simple point here. General, you don't like neither of my arguments. You don't like that. Before your time runs out, let me ask you another question. Your ROTC argument, you make, you devote a lot of attention in your brief to the military. Could you explain your ROTC argument to me? Sure. Why is it important for the ROTC program, for commissioned officers, that Texas have this other plan on top of the top 10% plan? Our military effectiveness depends on a pipeline of well-qualified and well-prepared candidates from diverse backgrounds who are comfortable exercising leadership in diverse settings. I understand that. I don't want to cut you off because the time is about to expire. You've got a marginal candidate who wants to go to the University of Texas at Austin and is interested in ROTC. Maybe if race is taken into account, the candidate gets in. Maybe if it isn't, he doesn't get in. How does that impact the military? The candidate will then probably go to Texas A&M or Texas Tech. Is it your position that he'll be an inferior military officer if he went to one of those schools? No, Justice Alito. And I understand the argument. The point of educational diversity, the point of what the University of Texas is trying to achieve, is to create an environment in which everyone develops an appropriate sense of citizenship. Everyone develops the capacity to lead in a racially diverse society. And so it will benefit every ROTC applicant from the University of Texas. And 43% of the officer corps comes from the ROTC. It's a very significant source of our military leadership. General, what is your view on how we tell when the university has attained critical mass? I don't think critical... I agree with my friend that critical mass is not a number. I think it would be very ill-advised to suggest... Okay, I'm hearing a lot about what it's not. So I'd like to know what it is. Because our responsibility is to decide whether this use of race is narrowly tailored to achieving, under this university's view, critical mass. May I answer? Oh, yeah. Thank you. I think... I don't think that this is a situation in which the court simply affords complete deference to the university's judgment that it hasn't yet achieved the level of diversity that it needs to accomplish its educational mission. I think that the court ought to... has to make its own independent judgment. I think the way the court would go about making that independent judgment is to look at a kind of information that the university considered. That could be information about the composition of the class. It could be information about classroom diversity. It could be information about retention and graduation rates. It can be information about... that's specific to the university's context and history. Is it a university that has had a history of racial incidents and trouble or not? A series of factors. And then what the court's got to do is satisfy itself that the university has substantiated its conclusion based on that... based on the information that's considered that it needs to consider race to further advance the educational goals that Grutter has identified as a compelling interest. And I will say, I do think as the number of minority enrollees retire, the burden on the university to do that is going to get harder to meet. But I don't think... I don't think there is a number, and I don't think it would be prudent for this court to suggest that there is a number because it would raise exactly the kind of problem that I think Justice Kennedy identified in the Grutter dissent of creating hydraulic pressure towards that number. We should probably stop calling it critical mass then because mass, you know, assumes numbers. Certain size or a certain weight. We should stop calling it mass. I agree. Call it a cloud or something like that. I agree that critical mass... the idea of critical mass has taken on a life of its own in a way that's not helpful because it doesn't focus the inquiry where it should be. If I may just add one... I think it's important, Your Honor, not just to the government but to the country that our universities have the flexibility to shape their environments and their educational experience to make a reality of the principle that Justice Kennedy identified and parents involved. That our strength comes from people of different races, different creeds, different cultures uniting in a commitment to freedom and to a more perfect union. That's what the University of Texas is trying to do with its admissions policy and it should be upheld. Thank you. Thank you, General. Mr. Ryan, ten minutes. Thank you, Mr. Chief Justice. That's more than I expected. Keeping the playing field level. That's what we're seeking in this case, Mr. Chief Justice, a level playing field for Abby Fisher. So it's most apt at this point. There's just three things I want to touch on. First, there's been a lot of back and forth on standing, but as we have pointed out, that really relates to merits and I just want to make clear that we do not accept the premise of that footnote that she would not have entered under any circumstances that they've asserted that but, in fact, she was considered for the summer program, which is... Is your complaint limited to injunctive relief and the return of the $100? As written, is that what it's limited to? No, because it said any and all of the damages at the point when we were writing it, which was... In Alvarez, we said any and all damages is too speculative. Is what you actually see, what I see, is the return of the $100. And what I'm saying is that we never had the opportunity to develop the full damage. In Arzonians, in Alvarez, we said you can't manufacture standing after the fact. Did you ask only for injunctive relief in the $100 specifically? The only specific number in the complaint because of the point in time when it was filed was the application fee, which we believe... And you would have paid that no matter what? Under any system of admonition, you would have paid the same $100? You would have paid the fee in return for a fair processing of the application, which you did not receive, and we think that's a claim that will be sustained. It's not tested at this point. And the second thing is because of the way the case was bifurcated, with the agreement of all and the district court as well, we did not develop the additional damages theory. We reserved the right to amend. And as things have progressed... For what? Nominal damages? No. And then how do you get around... Because as in the BIO, what UT pointed out was there are other kinds of financial injuries which were not ascertainable at the time the complaint was filed because we were trying to put her into the university. She was going to get a better job because she went to a different university? That's one of the things they suggested. There are differences in costs between what she paid at LSU and what she would have paid at UT. I'm just saying these are all reserved questions and they don't go to standing. The Court made that clear in Bakke. Let me go to another issue that, you know, I think I never completed my answer to Justice Breyer. Where we stand on what you should do about Grutter is as follows. We recognize, as in the words that the Solicitor General just issued, that there is an interest which is cognizable in diversity. That was the root question in Grutter. Could you recognize it at all? But what we are concerned about, as you see here, is universities like UT and many others have read it to be green light, use race, no end point, no discernible target, no critical mass in circumstances reduced to something that can be reviewed, and as long as you don't cross two lines, determinative points, and fixed quotas, quotas meaning we will fill this quota exclusively with who we deem to be underrepresented, you're okay. We don't think that's the way Grutter was intending. Grutter was intended to say this is an area of great caution. Using race itself raises all kinds of red flags. So before you use race, make a determination whether really your interest in critical mass, that is in the dialogue and interchange, the educational interest, is that— You're not suggesting that if every minority student that got into a university got into only the physical education program, and in this particular university that physical education program includes all the star athletes, so every star athlete in the school happens to be black or Hispanic or Asian or something else, but they've now reached the critical mass of 10, 15, 20 percent, that the university in that situation couldn't use race? In the holistic way that Grutter permits? If you're saying there's a differentiated department of physical education, which is like a separate college, you've changed the nature of the medical— No, it's just that every one of their students who happens to be minority is going to end up in that program. You don't think the university could consider that it needs a different diversity in its other departments? Well, if that were the case, remember the factor that's causing it, and you're assuming is choice. You have a critical mass of students. They choose to major in different things, and that's one of the base problems with the classroom diversity concept. They never ask the question why, if 40 percent of our students are minorities, are they not in the small classrooms? Why does that happen? Statistically, you would say, that's an aberration. You might ask the question, what's causing it? Because in order to fit— Are they saying the same thing when they say, when we're looking at the holistic measure, we're looking for that student who is a minority student who's a nuclear scientist? No. Because they don't take into account your interests. They don't ask you, are you going to join ROTC? They don't ask you, are you going to major in physics? And when it comes time in the UT system to allocate access to different majors, they do that in a way that is basically premised on academic index. So they have a two-tiered admission system. Their only here focus, their preference goes to admission as such. It doesn't go to sorting people out by majors. And if I might then say to Justice Breyer, I think our answer is, when we see what UT is doing, what we see that has been—and Brutus has just been perceived as a green light, go ahead and use race. Race, which is otherwise really a highly questionable, abominable kind of sorting out, that unchecked use of race, which we think has been spawned by misery, needs to be corralled. Is it any more unchecked than the Harvard plan that started all this off in 1978, cited by Justice Powell? Is it any different from how race is used in our military academies? There are two different questions. The Harvard plan is a very different world. It's a plan of wholly individualized admission, comparing individuals one-on-one to establish the platonic ideal of the class as the educational mission. This is not what's going on at UT. This is not an individualized, I will look at you. I will score you. I will score you individually. But as they keep saying, at the point of admission, I'm not admitting people. I'm admitting categories, boxes. And that relates to Justice Alito's question. I thought your hypothetical, Justice Alito, was entirely fair, because in the way they do their system, in the PAI scoring, you can figure out that two people would have had the same PAI score, but for race. It's an add-on. It allows them to boost the PAS component of the PAI score. So, it's not infrequent. There are many, many candidates who will score the same PAI, may even have the same AI, and then you boost some of them. Now, what UT says is, well, we don't boost all the minorities. And as I stood here today, and they said in their brief, we want to boost the ones we like. We want those affluent minorities who we think will improve, in our view, dialogue. That is contrary, indeed, to the fact that they give points in the same system for socioeconomic disadvantage. It's at odds with itself. But it's purely race. And it comes to the ultimate question, then, which, Chief Justice, you were asking, where's the end point? If you have nothing to gauge the success of the program, if you can't even say at the beginning, we don't have critical mass because we don't know what it is and we refuse to say what it is, there's no judicial supervision, there's no strict scrutiny, and there's no end point to what they're doing. So, what we have said, and it comes right back to Justice Breyer, how would you write it? You can clarify it. You can say Grutter properly applies, requires you to do A, B, C, and we've said in our brief that would be satisfactory. But to the extent that you then have it surviving side by side, there could be enormous confusion. What you want me to do is go read back what we wrote in Grutter. Go look what the underlying determinations of critical mass were there. Go look exactly how it's being done in Texas, which have charts that help me see that. And I will then find enough of a difference that I can write some words that can be administered by two or three thousand federal judges as they try to deal with programs like this. And that's the point. Is that right? Well, I'm saying if you clarify the needs and the necessity point, if you then look at some of the other deficiencies and clarify the consideration of reasonably available alternatives and necessity, if you then attribute that, if you attribute the weaknesses of the Texas program to the absence of those factors, I think you can fashion a result in this case, which may or may not have to, quote, overrule Grutter. It's really a matter of do you want to clearly restate what it is that allows the use of this odious classification? That's what we're talking about. It's a narrow window. So you don't want to overrule Grutter. You just want to gut it. You don't want to overrule it, but you just want to gut it. Now you want to tell universities that once you reach a certain number, then you can't use race anymore. I don't want to gut it, and the only way one could reach that conclusion is to assume that Grutter is an unlimited mandate without endpoint to just use race to your own satisfaction and to be deferred to in your use of race. That is unacceptable. That is the invasion of Abigail Fisher's rights to equal protection of law. Thank you. Thank you, counsel. The case is submitted.